# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 678 | **DATE** | 11/20/2003 |
| **CASE TITLE** | Sequel Capital, LLC vs. Rothman, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due__ ____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for __ ___ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Motions to dismiss filed by Rothman and Colon [12] and Chakos and Manta [20] are granted in part and denied in part. Plaintiff granted leave until 12/15/03 to file its first amended complaint. Defendants shall have 21 days thereafter to answer. Status hearing is set for 1/15/04 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 24 2003 | 23 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | 11/20/2003 | |
| | MD | courtroom deputy's initials | date mailed notice | |
| | | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

|  |  |  |  |
|---|---|---|---|
| SEQUEL CAPITAL, LLC, | ) | | |
| | ) | | |
| Plaintiff, | ) | | **DOCKETED** |
| | ) | | |
| vs. | ) | No. 03 C 0678 | NOV 2 4 2003 |
| | ) | Judge Joan H. Lefkow | |
| MICHAEL G. ROTHMAN, MICHAEL J. | ) | | |
| CHAKOS, WILFRED COLON, JOHN L. | ) | | |
| MANTA, CLEANUP ACQUISITION, LLC, | ) | | |
| and INDUSTRIAL CLEANING | ) | | |
| SPECIALISTS, INC., | ) | | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sequel Capital LLC, ("Sequel"), brings this law suit alleging that defendants,

Michael G. Rothman, Michael Chakos, Wilfred Colon, John L. Manta, Cleanup Acquisition,

LLC and Industrial Cleaning Specialists, Inc., violated § 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78k(b), and Rule 10b-5 promulgated under 78j(b), by knowingly and/or

recklessly making false and misleading statements about Kenny Industrial Services, LLC

("Kenny Industrial").[1]  Sequel also alleges violations of § 20(a) of the Securities Exchange Act of

1934, 18 U.S.C. § 78t(a), the Illinois Securities Law of 1953, 815 ILCS 5/1 *et seq.*, and common

law fraud.  Defendants have moved to dismiss the claims for failure to state a claim upon which

relief may be granted under Federal Rule of Civil Procedure 12(b)(6) and for failure to satisfy the

pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities

---

[1] Hereinafter the individual defendants will be referred to by their last names.

Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA"). For the reasons set forth below, the defendants' motions are granted in part and denied in part.[2]

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy* v. *Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke* v. *City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *see also DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Although states of mind may be pleaded generally [under Rule 9(b)], the 'circumstances' must be pleaded

---

[2]Rothman and Colon are represented by separate counsel from Chakos and Manta and each set of defendants have filed their own separate motions to dismiss. Cleanup and Industrial are not listed on either motion and have filed no responsive pleading. The court refers to all defendants collectively except when noted otherwise.

2

in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."). "'Because only a fraction of financial deteriorations reflects fraud,' . . . plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors." *Arazie* v. *Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993) (quoting in part *DiLeo*, 901 F.2d at 628).

Further, in addition to Rule 9(b), the PSLRA imposes "heightened pleading requirements" to discourage claims of "so-called 'fraud by hindsight.'" *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001). Section 78u-4(b) "requires a court to dismiss a complaint that fails to (1) identify each of the allegedly material, misleading statements, (2) state facts that provide a basis for allegations made on information and belief, or (3) state with particularity 'facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at *4.

## ALLEGATIONS OF THE COMPLAINT

### A.  BACKGROUND

This case centers around a transaction in which Sequel acquired an additional equity interest in Kenny, which was formed in 1998 by Rothman as "a vehicle for acquiring and consolidating the operations of specialty contractors that provided industrial coatings and/or cleaning services." (Compl. ¶¶ 1, 22.) Kenny provides services in industrial coating (including painting, protective coating, fireproofing surface preparation, concrete restoration and lead abatement) and in industrial cleaning (including dry/wet vacuuming of machinery and storage vessels, high pressure hydroblasting to remove paint and other coatings and sewer cleaning). (Compl. ¶ 23.) At all times relevant to this action Rothman served as Kenny's chief executive

officer, Chakos as Kenny's chief operating officer and an Operating Board member, Colon as president of the Midwest industrial cleaning business, and Manta as president of the Midwest Division. (Compl. ¶¶ 10-13.) Moreover, at all relevant times defendant Cleanup Acquisition LLC ("Cleanup Acquisition") was an Illinois limited liability company owning approximately 14% of the equity interests of Kenny and is the entity through which Sequel purchased the majority of its preferred interests in Kenny. (Compl. ¶ 14.) Defendant Industrial Cleaning Specialists, Inc. ("Industrial Cleaning") was owned by Rothman and is a member of Cleanup Acquisition and the beneficial owner of preferred membership interests in Kenny through Cleanup Acquisition. (Compl. ¶ 15.)

Since its formation in 1998, Kenny has grown entirely through acquiring existing coatings and cleaning businesses, retaining current management of these businesses and seeking to preserve customer relationships. (Compl. ¶ 23.) In its first three years of operation, Kenny acquired ten such businesses located throughout the United States. (Compl. ¶ 23.) As a result of these acquisitions, Kenny's 2002 business plan states that its pro forma revenue grew from $164 million in 1998 to $216 million in 2001, and its pro forma "earnings before interest, taxes, depreciation and amortization" ("EBITDA") increased from $10 million in 1998 to $24 million in 2001. (Compl. ¶ 23.) However, beginning in 2002, Kenny experienced significant deterioration in its operations and financial performance. (Compl. ¶ 24.) Kenny was allegedly "plagued by poorly performing operating divisions, mismanagement at the division level, customer dissatisfaction and cancelled orders, and unprofitable long term contracts, all of which resulted in sharply declining revenues, high relative fixed and variable costs and plummeting operating profits." (Compl. ¶ 24.)

4

By way of example, the Complaint contains a number of allegedly poor performing operating divisions. The Genesee Coating division, which was acquired by Kenny in February 2000 for $11 million, is alleged to have had an EBITDA of $.04 million for the first six months of 2002 as a result of mismanagement. By November 30, 2002, the Genesee division had sustained a loss of almost seven million dollars, far short of Kenny's projections in its 2002 business plan of EBITDA of $3.4 million for 2002. (Compl. ¶ 26.) Kenny's sewer cleaning business is alleged in the first six months of 2002 to have generated revenues of only $3 million and EBITDA of $555,000, well short of Kenny's projection of $10 million in revenue and EBITDA of $3.3 million. (Compl. ¶ 27.) Kenny's waste minimization contract with USX Corporation ("USX") is also alleged to have lost money and an outside consulting group reported that Kenny "d[id] not belong in this business" and estimated that approximately $2 million would have to be accrued on the September financial statement for losses from the USX contract. (Compl. ¶ 30.) Finally, the Complaint further alleges that Kenny's Houston region was operating at a loss for the first six months of 2002 despite Kenny's projections that the region would be profitable. (Compl. ¶ 31.)

The Complaint alleges that in an effort to shore up its financial condition, pay down its primary line of credit and prevent a "financial meltdown," Rothman and the other individual defendants jointly decided to solicit an equity infusion in Kenny through a rights offering to existing equity holders. (Compl. ¶ 33.) Although this rights offering was only open to existing equity holders of Kenny, these equity holders were permitted to solicit investor participation through limited liability companies owned by existing shareholders. (Compl. ¶ 34.) According to the Complaint, in late June 2002, Rothman and Chakos, who both held equity interests in

5

Kenny and could purchase additional equity under the rights offering, approached Sequel to solicit its participation in a portion of the rights offering. (Compl. ¶ 35.) Sequel was an existing lender to Kenny and a lessor of certain equipment utilized in Kenny's business. (Compl. ¶ 35.) Rotham and Chakos advised Sequel that they further represented the interests of Colon and Manta, who also held equity interests in Kenny and could participate in the rights offering, and were authorized to represent Colon and Manta's interest in the negotiations. (Compl. ¶ 35.) Rothman and Chakos proposed that Sequel invest in an entity whose sole purpose was to hold the equity interests in Kenny, and that this entity would in turn lend the proceeds from Sequel's investment to the individual defendants to enable them to exercise their rights to purchase additional preferred interests in Kenny pursuant to the rights offering, and then transfer those interests to the holding entity. (*Id.*) The individual defendants did not intend to invest any of their own money in the rights offering but, rather, planned to use Sequel's funds, along with their existing equity in Kenny, to capitalize the holding entity. (*Id.*)

**B. ALLEGED FALSE AND MISLEADING STATEMENTS**

Surrounding this transaction, the Complaint alleges that numerous false and/or misleading statements and omissions were made to Sequel. Each statements is alleged to have been made while defendants knew or recklessly disregarded the severe financial and operational problems facing Kenny, which were not disclosed to Sequel prior to its investment. For clarity, the court separates the statements as follows: (1) statements in Kenny's business plan; (2) statements of future projections; (3) statements of past performance/accounting information; and (4) statements at meetings.

*1.    Kenny's business plan*

To solicit participation in the rights offering, Rothman and Chakos furnished Sequel with Kenny's 2002 business plan. The business plan stated that Kenny had been very successful in integrating the businesses it had acquired (including Genesee and Canisco Resources) in part because it retained management of the legacy firms to take advantage of their years of experience and ensure continuity of customer relationships. (Compl. ¶ 36.) The Complaint alleges that these statements were materially false and or misleading when they were furnished to Sequel because the defendants failed to disclose that in 2002 the Genesee division was losing money at an "alarming rate," in part because of mismanagement by the retained management personnel. (*Id.*) Moreover, the Complaint alleges that the defendants failed to disclose that the Houston Region was also operating at a loss, due in part to the inability of acquired management from Canisco Resources to manage the business from out of state. (*Id.*)

Kenny's 2002 business plan also touted Kenny's sewer cleaning services and its long-term contracts for those services with various municipalities located in the Midwest Region. (Compl. ¶ 38.) These statements are alleged to be false or misleading at the time Sequel was furnished with the business plan because defendants failed to disclose that in 2002 Kenny's sewer cleaning business in the Midwest Region was falling far short of revenue and profit projections. (Compl. ¶ 39.) This is allegedly because a number of accounts had been cancelled or transferred to competitors due to Kenny's inability to complete backlogged orders. (*Id.*)

Finally, Kenny's 2002 business plan also described the new waste minimization contract Kenny had entered into with USX in 2001 as "validation, by the marketplace, of the [Kenny] thesis that success would be achieved by becoming a 'single source vendor providing multiple

7

services nationwide" through the "creation of a field office, with manpower and equipment at either a single site or a customer's multiple sites across the country." (Compl. ¶ 40.) According to Kenny's business plan, the USX contract had a value of $9 million annually, making USX one of Kenny's largest customers. (*Id.*) The Complaint alleges that the representations in the business plan regarding the value of the USX contract and the validation it offered of Kenny's business model were materially false or misleading at the time the business plan was furnished to Sequel because defendants failed to disclose that the USX contract was plagued by lack of financing and poor project management and was losing money at an alarming rate. (Compl. ¶ 41.)

### 2. *Future projections*

Kenny's 2002 business plan furnished to Sequel also contained revenue, profit and investment return projections. (Compl. ¶ 42.) These projections reflected revenues for 2002 of $247.3 million, EBITDA of $25 million, and an internal rate of return ("IRR") ranging from 41.8% to 46.5% annually. (*Id.*) The Complaint alleges that the revenue, EBITDA and IRR projections lacked any reasonable basis at the time they were furnished to Sequel because of the severe operational and financial problems plaguing Kenny during this time period. (Compl. ¶ 43.)

The 2002 business plan also contained a budget for Kenny, which projected revenues for 2002 of $249 million and EBITDA of $26 million. Sequel alleges that these projections lacked any reasonable basis when they were furnished to Sequel because of Kenny's severe operational and financial problems during this time period. (Compl. ¶ 44.)

In late June or early July 2002, Rothman and Chakos furnished Sequel with additional projections dated June 24, 2002, based on an equity infusion of $22.5 million. (Compl. ¶ 47.) These projections reflected 2002 revenues of $247.2 million, EBITDA of $22.5 million, and an IRR ranging from 42.4% to 47% annually, based on a proposed investment of $22.5 million. (*Id.*) The Complaint alleges that when defendants furnished Sequel with these projections, they lacked any reasonable basis given the severe operational and financial problems with Kenny's business during this time period. (Compl. ¶ 48.)

At some point after July 16, 2002, Rothman and Chakos furnished Sequel with documentation relating to the rights offering, including a preemptive rights notice dated July 16, 2002 and a securities purchase agreement pursuant to which the preferred interests in Kenny were being sold ("Securities Agreement"). (Compl. ¶ 49.) The Securities Agreement stated, with respect to the financial projections for 2002-2006, that these "contain management's reasonable best estimates of [Kenny's] future operating results and were prepared in good faith based upon methods, assumptions and data [Kenny] believes to be reasonable in light of the circumstances currently in effect." (Compl. ¶ 51.) The financial projections attached to the Securities Agreement projected revenues for 2002 of $247 million, EBITDA of $25.5 million, and an IRR ranging from 29% to 32.8% annually. (*Id.*) Sequel alleges that the revenue, EBITDA and IRR projections lack any reasonable basis in light of the severe operational and financial problems with Kenny's business during this time period.

3.    *Past performance/accounting information*

Attached as schedules to the Securities Agreement were Kenny's financial statements for the year ending December 31, 2001, and for the five-month period ending May 31, 2002. The

9

Complaint alleges that Kenny's May 31, 2002 financial statements furnished to Sequel contained materially false and misleading information regarding, among other things, accrued expenses and revenues. (Compl. ¶ 50.) The May 31, 2002 balance sheet reflects accrued expenses of $7,440,168 and revenues for the five-month period totaling $88,865,936. (*Id.*) According to the Complaint, however, Kenny's financial statements for the nine-month period ending September 30, 2002, showed accrued expenses of almost $17 million, more than a 100% increase from the period ending May 31, 2002. (*Id.*) Sequel alleges that this indicates the defendants were concealing accrued expenses until after the equity infusion was completed.

Furthermore, the Complaint alleges that while the May 31, 2002 financial statements reflect average monthly revenues of approximately $18 million for the first five months of 2002, the financial statements for the period ending September 30, 2002 reveals a dramatic decline in revenue, with average monthly revenues for the period June through September 2002 of just over $12 million per month, which Sequel believes indicates that the defendants were improperly accelerating revenues to support their revenue projections for 2002 until the equity infusion had been accomplished.[3]  (*Id.*)

The Securities Agreement further states the following with respect to undisclosed liabilities:

> There are no liabilities, whether accrued, contingent, absolute, determined, determinable or otherwise, of the Company other than (a) liabilities fully provided

---

[3] Sequel alleges similar misrepresentations in consolidated financial statements (for the six-month period ending June 30, 2002) furnished by Rothman and Chakos to Sequel in July 2002. (Compl. ¶ 57.) The balance sheet reflected accrued expenses for the six-month period of $8,045,647, and the statement of operations reflected revenues for the six-month period of $106,909,179. (*Id.*) Sequel maintains that the accrued expenses listed in the June 30, 2002 financial statements increased by 100% in the September 30, 2002 financial statement and that revenues decreased to a significant degree. Sequel maintains that accrued expenses must have been concealed and revenues inflated until after the equity infusion was completed. (Compl. ¶ 58.)

for in the 2001 Financial Statements or the May 2002 Financials, (b) liabilities disclosed on the Schedules hereto, and (c) other liabilities incurred since the Balance Sheet Date in the Ordinary Course of Business which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(Compl. ¶ 53.) Sequel alleges that this representation in the Securities Agreement regarding undisclosed liabilities was materially false and misleading when it was furnished to Sequel because the September 30, 2002 financial statements reflect accrued expenses of approximately $176 million, more than a 100% increase from the five-month period ending May 31, 2002. (Compl. ¶ 54.) Sequel alleges that this indicates defendants were concealing accrued expenses until after the equity infusion was completed and that defendants knew or recklessly disregarded that the Securities Agreement contained false and misleading information regarding any undisclosed liabilities. (*Id.*)

The Securities Agreement also states that since December 31, 2001, there had not been "any event, occurrence, development, circumstances or state of facts which has had or which could reasonably be expected to have a Material Adverse Effect" on the Company. (Compl. ¶ 55.) Sequel alleges that this statement is false and misleading because of the severe operational and financial problems with Kenny's business during the time period that the Securities Agreement was furnished to Sequel. (Compl. ¶ 56.)

4.   *Statements at meetings*

Sequel alleges that Rothman and Chakos had a number of meetings in 2002[4] with Sequel's principals in connection with the rights offering. Sequel alleges that during these

---

[4]The meetings are alleged to have taken place on April 22, May 9, 11, 30, June 3, 5, 24, 27, 28, 29, July 11, 17, 18 and 26. (Compl. ¶ 59.)

meetings Rothman and Chakos stated that (a) Kenny was a highly profitable company with great prospects for revenue and profitability growth; (b) Kenny had successfully integrated and consolidated the various businesses it had acquired and had reduced expenses; (c) USX was one of Kenny's largest customers with whom Kenny had a long-term, profitable contract to provide waste minimization services; (d) Sequel could reasonably anticipate an IRR in excess of 40% annually on its investment; and (e) given the pricing of the offering at 6.5 times EBITDA, it was an opportunity that Sequel could not afford to pass up. (Compl. ¶ 59.) Sequel alleges that these statements were false and misleading when they were made because Kenny was suffering severe operational and financial problems at this time which both Rothman and Chakos were both aware of. (Compl. ¶ 60.)

## C.  SEQUEL'S INVESTMENT IN KENNY

On July 31, 2002, Kenny entered into an agreement with all defendants (the "Purchase Agreement"), under which Sequel purchased 2,000 Class A preferred interests and 1,600 Class B preferred interests in Cleanup Acquisition, for an aggregate purchase price of $3,617,863.06. (Compl. ¶ 62.) The Purchase Agreement stated that

> This Agreement constitutes the entire agreement among the Parties with respect to the Subject Matter of this Agreement. This Agreement (including the Exhibits hereto) and the Amended and Restated Operating Agreement supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof of this Agreement.

(Compl. Ex. A ¶ 8.12.)[5] The Purchase Agreement also listed the representations made by each of the parties. For Chakos and Manta, the Purchase Agreement stated that each represented that

---

[5] The court considers the Purchase Agreement on this motion to dismiss because it is attached to Sequel's Complaint. *See, e.g., Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002); *Beanstalk Group, Inc. v. Am Gen. Corp.,* 283 F.3d 856, 858 (7th Cir. 2002).

they would have secured ownership of the securities for which Sequel was acquiring an interest. (Compl. Ex. A ¶¶ 4.2-4.3.) Rothman, Colon, Cleanup Acquisition and Industrial Cleaning made representations concerning (1) existence and power of Cleanup; (2) authorization and enforceability of any agreements Cleanup entered into; (3) governmental authorization; (4) non-contravention and consents; (5) capitalization; (6) subsidiaries; (7) undisclosed liabilities of Cleanup; (8) tax matters; and (9) litigation against Cleanup, Rothman or Colon.

On or about the date the Purchase Agreement was signed, Cleanup entered into an agreement with Sequel and the remaining defendants (the "Exchange Agreement") under which the remaining defendants transferred to Cleanup certain Class E preferred interests they had purchased in Kenny pursuant to the rights offering using the proceeds from Sequel's investment in Cleanup Acquisition, which had been loaned to them by Cleanup to facilitate the purchase of the preferred interests. (*Id.*) Rothman, Colon and Industrial Cleaning also transferred to Cleanup certain Class B membership interests they owned in Kenny in exchange for interests in Cleanup Acquisition. (*Id.*) Defendants did not, however, invest any of their own money in Kenny or Cleanup Acquisition pursuant to the rights offering. (*Id.*)

Also on or about July 31, 2002, Sequel entered into a separate agreement with Rothman, Chakos, Colon and Manta, entitled "Agreement for Purchase and Sale of Interests in Kenny Industrial Services, LLC," under which Sequel purchased from Rothman, Chakos, Colon and Manta, additional Class E preferred interests in Kenny totaling $340,006.28, for which Sequel had loaned Rothman, Chakos, Colon and Manta the money to effectuate the purchase.[6] (Compl.

---

[6]This agreement also stated that it "embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof, except for the Employment Agreement which shall remain in full force and effect." (Compl. Ex. B

13

¶ 63.) On July 26 and August 2, 2002, Sequel purchased additional preferred interests in Kenny based on its status as an equity holder in Kenny, for which it paid the aggregate purchase price of $78,922.33. (Compl. ¶ 64.) Thus, Sequel's investment in Kenny pursuant to the rights offering, both directly and through Cleanup, totaled $4,036,791.67. (*Id.*)

According to the Complaint, five weeks after Sequel made its investment, Rothman acknowledged in a memorandum (the "Rothman Memo") dated September 3, 2002 and addressed to one of Kenny's equity investors that during the first seven months of 2002, Kenny had been experiencing severe operational and financial problems. (Compl. ¶ 65.) By mid-November, an outside consulting group determined that the Genesee division needed to be closed by the end of the year, that Kenny was generating substantial losses and that the "bleeding" needed to be stopped at the Houston Region due to high fixed costs and lack of new business. (*Id.*) Shortly thereafter, Rothman was replaced as CEO of Kenny and Chakos was put on administrative leave pending additional investigation. (*Id.*)

## DISCUSSION

### A. Count I: Section 10(b)

Section 10(b) of the Securities Exchange Act of 1934 provides,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission ["SEC"] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

---

¶ 3.8.)

Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish liability under § 10(b) and Rule 10b-5, a plaintiff must prove that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Caremark, Inc.* v. *Coram HealthCare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997); *Searls* v. *Glasser*, 64 F.3d 1061, 1066-67 (7th Cir. 1995); *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 WL 262369, at *9 (N.D. Ill. Feb. 7, 2003). In their motion to dismiss the § 10(b) claims, defendants argue that Sequel's Complaint fails to adequately allege (a) any misstatements or omissions of material fact, (b) scienter, or (c) justifiable reliance.

*1.     Material misstatements or omissions of material fact*

A material misrepresentation is found where a defendant "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls*, 64 F.3d at 1065. A statement is material if "a reasonable investor would have considered [the statement] a reason to buy (or not sell, if he already owned) stock . . . ." *Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

15

*a.     Statements of past performance*

Defendants first move to dismiss the alleged misrepresentations of Kenny's past performance because such statements are "classic fraud by hindsight." According to defendants, any claims based on these statements must be dismissed because Sequel does not plead actual facts regarding fraud (i.e., showing that accrued expenses were concealed and revenues accelerated) but instead only suggests the possibility of fraud based on statements later contained in the September 30, 2002 financial statements that reflected significant increases in accrued expenses and decreases in revenues. In response, Sequel asserts that (1) the Complaint alleges that Kenny's Genesee division and sewer cleaning business were generating revenues far below expectations for the first six months of 2002 and it is therefore reasonable to infer that the revenues in the May 31, 2002 and June 30, 2002 financial statements are overstated; (2) the Complaint further alleges that members of Kenny's management team who replaced Rothman and Chakos informed Sequel that they had discovered evidence that defendants had deliberately concealed and held back expenses during 2002 to enhance Kenny's balance sheet and income statement; and (3) without access to Kenny's books and records (now in possession of the Federal Bureau of Investigation, who has recently begun an investigation), it is hard-pressed to come up with additional facts to substantiate the allegations that defendants accelerated revenues and deferred expenses.

Despite Sequel's best efforts, however, it simply has not pled sufficient facts under Rule 9(b) to show that the statements of past performance in the financial statements or the Securities Agreement were the result of fraud. *Cf. Arazie*, 2 F.3d at 1467-68 ("[T]emporal proximity between positive statements stressing a firm's strengths and announcements of poor economic

16

condition do not create an inference that the earlier statements were fraudulent."). In essence, Sequel's argument is that because the accrued expenses increased by 100% from the period ending May 31, 2002 and average monthly revenues also declined, these increases and decreases must have been attributable to fraud because defendants likely withheld accrued expenses and falsely increased revenues to solicit Sequel's participation in the equity infusion. The Complaint, however, "offers no information other than the differences between the two statements of the firm's condition." *DiLeo*, 901 F.2d at 627. Sequel was required to "point to some facts suggesting that the difference is attributable to fraud." *Id.* The Complaint fails to accomplish this. While Sequel argues that it has previously pled facts showing that the Genesee and sewer cleaning divisions were generating revenues far below expectations for the first six months of 2002, thereby making it reasonable to infer that the May 31, 2002 and June 30, 2002 financial statements were overstated, the court disagrees. Simply because those divisions were underperforming does not create this inference, and no facts have been supplied to support it. Moreover, while Sequel maintains that the new members of Kenny's management team informed Sequel that they had discovered "evidence" that defendants had deliberately concealed and held back expenses during 2002 to enhance Kenny's balance sheet and income statement, it nonetheless fails to describe what in fact that evidence was.

Finally, concerning Sequel's argument that because it does not have access to the records to substantiate allegations that defendants accelerated revenues and deferred expenses it cannot plead such facts, the court notes that Sequel has not pled sufficient facts to show even an inference that expenses were concealed and revenues accelerated. *Cf. NeoPharm*, 2003 WL 262369, at *11. Here all that has been pled is that accrued expenses went up and revenues went

17

down after the equity infusion, which Sequel believes was attributable to fraud. To allow an inference to exist under such facts, however, would allow fraud by hindsight and rob Rule 9(b) of most of its teeth. Accordingly, defendant's motion to dismiss the claims based on these statements is granted.

b.    *Projections of future performance*

Defendants next move to dismiss the alleged misrepresentations of future performance. In situations where a future projection is alleged to have been a material misrepresentation, the statement is not fraudulent "simply because later events show that a different projection would have been more reasonable." *Kleban* v. *S.Y.S. Rest. Mgmt., Inc.*, 994 F. Supp. 932, 939 (N.D. Ill. 1998) (citing *Grassi* v. *Information Res., Inc.*, 63 F.3d 596, 599 (7th Cir. 1995)). Instead, a plaintiff must allege "specific facts which illustrate that [the] predictions lacked any reasonable basis." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996) (citing *Arazie*, 2 F.3d at 1468).

According to defendants, Sequel makes no showing that these future projections are inaccurate. Defendants maintain that the "severe operational and financial problems" that Sequel believes made the projections false did not come to light until the Rothman Memo was written on September 3, 2002 and a November 2002 memo was written by an outside consulting group. (Compl. ¶¶ 26, 30-32, 66.) Since these documents were generated in September or November 2002, months after the projections were given to Sequel in June and July of 2002, defendants maintain that the projections cannot be either unreasonable or inaccurate.

In response, Sequel alleges that while the memos themselves may not have been authored until September or November 2002, they make numerous references to the severe operational and

financial problems taking place during the time the projections were given to Sequel. By way of example, Sequel points out that the Rothman Memo states that for the first six months of 2002, the Genesee division sustained an EBITDA loss of $.04 million, rather than generating profits in line with the projected EBITDA level for that division of $3.4 million for the full year. The Rothman Memo further states that for the first six months of 2002 the sewer cleaning business managed revenues of only $3 million and EBITDA of only $550,000, short of the projected $10 million in revenue and $3.3 million in EBITDA projected for the full year. Finally, Sequel notes that the Rothman Memo further describes losses of $80,000 per month during the first six months of 2002 as a result of lack of financing and poor project management in connection with the USX contract and further describes the Houston Region as losing money. Sequel uses references to these losses taking place during the first six months of 2002 to support its theory that projections made to Sequel prior to its investment lacked any reasonable basis.

This court has previously allowed claims to go forward in similar situations, such as when a director makes a statement about a Phase II clinical test with knowledge that the Phase I results have failed or regressed to such a degree that the entire project was "back to the drawing board," *NeoPharm*, 2003 WL 262369, at *11, or when a defendant is aware that sales to a top buyer were going to drop "precipitously" but nonetheless speaks publicly with optimism concerning such sales to that buyer. *In re Westell Techs., Inc. Sec. Litig.*, No. 00 C 6735, 2001 WL 1313785, at *8 (N.D. Ill. Oct. 26, 2001). Putting aside the issue of scienter for the moment, so long as the pleadings here sufficiently allege that the defendants had knowledge of the losses taking place during the first six months of 2002, and assuming at least for now the future projections which speak glowingly of Kenny's future can be imputed to all defendants, a

reasonable jury could find that the future projections were misleading and lacked any reasonable basis.

Naturally, defendants argue that Sequel has failed to allege they had knowledge of the losses and deteriorating financial performance of Kenny when the future projections were made. Sequel does not actually plead how each defendant individually had knowledge of the losses and deteriorating financial performances but instead argues that by virtue of the defendants' positions as Operating Board members and/or senior managers, they knew or should have known of the pervasive operational and financial problems that Kenny was experiencing during the first six months of 2002. The court agrees generally that an inference may exist that officers and directors, by virtue of their positions with a company, could have knowledge of a company's deep financial difficulties. *See Dardick v. Zimmerman*, 149 F. Supp. 2d 986, 988-89 (N.D. Ill. 2001) ("To the outsider looking in, it is surely strongly inferential that every officer or director of [the company] either had the knowledge of such deep financial difficulties or, if not, that his failure to have such knowledge equated to reckless disregard."); *Westell*, 2001 WL 1313785, at *9. The analysis in this case turns on whether each defendant, by virtue of his respective positions, could be said to have had knowledge of Kenny's financial and operational problems.

For Rothman and Chakos, the answer is clearly yes, as they served as chief executive officer and chief operating officer respectively, and both also served as Operating Board Members. The question is closer with respect to Colon and Manta. Colon served as president of Kenny's Midwest industrial cleaning business while Manta was president of the Midwest division. Neither is alleged to have been an officer or director of Kenny, and any inference that could be imputed to Rothman and Chakos certainly appears tenuous as to Colon and Manta.

20

While Colon and Manta could be said to have knowledge of the poor operating and financial performance of the sewer cleaning business and the Genesee division (both of which were in the Midwest division), it is not appropriate to impute to them knowledge of Kenny's overall financial and operational failures. However, the Complaint attempts to allege that Colon and Manta are liable under an agency theory, which is discussed below. Sequel submits that Colon and Manta's knowledge is irrelevant if they acted as principals and Rothman and Chakos as their agents. Thus, the court will allow the claims to stand against Colon and Manta pending analysis of whether agency has been sufficiently pled.[7]

### c.  *Remaining statements*

Defendants seek dismissal of the remaining statements on grounds that they constitute mere "puffing." Material misstatements cannot be "forward-looking . . . generalized statements of optimism that are not capable of objective verification." *Grossman* v. *Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997); *see also, Eisenstadt*, 113 F.3d at 746 ("mere sales puffery is not actionable under Rule 10b-5."). By way of example, defendants contend that the following statements are puffing: (1) "[Kenny] has very successfully integrated the acquisitions" and has "an unparalleled management team;" (2) the USX contract is "validation, by the marketplace, of

---

[7]Defendants similarly argue that statements in the 2002 business plan regarding the USX contract and the sewer cleaning business should be dismissed because there is no showing of falsity. According to defendants, Sequel has not pled facts establishing that the statement valuing the USX contract at $9 million in annual revenues was false. Defendants also claim that the statement that Kenny had "long-term" contracts with municipalities to perform sewer cleaning services has also never been pled as being false. However, "the disclosure required by the securities law is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lindelow* v. *Hill*, 00 C 3727, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001). While these statements made may have been technically correct, Sequel argues that they were misleading because defendants did not mention (1) the substantial losses that were being generated as a result of the USX contract or (2) that the sewer cleaning business was falling far short of revenue and profit projections for the first six months of 2002 and that many customers had either cancelled orders or transferred them to competitors. Based on these alleged omissions, a reasonable jury could find that these statements were misleading.

the [Kenny] thesis that success would be achieved by becoming a single source vendor providing multiple services nationwide;" and (3) "Kenny was a highly profitable company with great prospects," "Kenny had successfully integrated," and the rights offering "was an opportunity that Sequel could not afford to pass up."

The court agrees that no reasonable investor would rely on most of the above statements. For example, declaring that Kenny has an "unparalleled management team," is a "highly profitable company" or that this was an "opportunity Sequel cannot pass up" are statements that are "impossible to objectively verify." *See In re Sun Healthcare Group*, 181 F. Supp. 2d 1283, 1291 (D. N.M. 2002). However, with respect to the alleged statements concerning the integration of businesses (e.g., "[Kenny] has very successfully integrated the acquisitions"), such statements could be objectively verified and, moreover, Sequel, acting as a reasonable investor, could have relied on such information and these facts may have "significantly altered the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at 14 (N.D. Ill. Nov. 14, 2000). As stated above, if the defendants had knowledge that in fact Kenny had not successfully integrated the acquisitions, which an inference can be made that Rothman and Chakos did, a reasonable jury could find these statements to the contrary as misleading.

2. *Scienter*

"Scienter 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Westell*, 2001 WL 1313785, at *10 (quoting *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997)). "Reckless

22

conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm*, 954 F. Supp. at 1255 (citing *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir. 1978)).

Defendants argue the allegations of the Complaint do not adequately allege scienter because (1) there are no allegations that any of the defendants actually acted and (2) if the defendants did act, there are no allegations that the particular defendants had the requisite state of mind. Concerning the first argument, defendants argue that a pleading must demonstrate each individual defendant's responsibility for the conduct alleged. *E.g.*, *Fishman* v. *Meinen*, No. 02 C 3433, 2003 WL 444223, at *5 (N.D. Ill. Feb. 24, 2003) ("Where a plaintiff alleges that a group of individuals is part of a fraudulent scheme, he or she must put each defendant on notice of his or her allege role.").

Sequel, in response, relies on the so-called "group-pleading doctrine," which allows a plaintiff "to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Sutton* v. *Bernard*, No. 00 C 6676, 2001 WL 897593, at *5 n. 5 (N.D. Ill. Aug. 9, 2001). In deciding whether this doctrine has survived the PSLRA, this court has adopted Judge Shadur's approach that the "proper course" is to examine each individual's liability based on each "defendant's own conduct (or, where applicable, on respondeat superior principles.)" *Dardick*, 149 F. Supp. 2d at 987.

Similar to the analysis above, any statements furnished to Sequel can fairly be characterized as the collective work of Rothman and Chakos (as CEO and CFO respectively), but not Colon and Manta. However, Colon and Manta's liability must be examined by reference to agency principles. An agency relationship is formed when a principal has the right to control the agent and the agent can affect the principal's legal relationships. *Chemtool, Inc.* v. *Lubrication Techs., Inc.,* 148 F.3d 742, 745 (7th Cir. 1998). The requirements of pleading agency in fraud cases is dependent on whether the "same circumstances" are used to establish the alleged fraud and the agency relationship. *See Lachmund* v. *ADM Investor Servs. Inc.,* 191 F.3d 777, 783 (7th Cir. 1999). If the same circumstances are used to plead both fraud and agency, then the particularized pleading requirements of Rule 9(b) "apply with equal force to the issue of agency and to the underlying fraud claim." *Id.*

In *Lachmund,* the plaintiff attempted to show an agency relationship between a corporation registered with the Commodities Futures Trading Commission ("CFTC") as a Futures Commission Merchant and a partnership registered by the CFTC as an introducing broker. *Id.* at 780. After concluding that status as an introducing broker itself was insufficient for an agency relationship, the court noted that the plaintiff relied on his allegations of conspiracy in his complaint to allege an agency relationship. *Id.* The court, therefore, applied the heightened Rule 9(b) requirements because plaintiff's claim "depend[ed] . . . on the substantive allegations of fraud to establish the agency relationship." *Id.*

Applying the *Lachmund* standard here, the court sees nothing in the Complaint to suggest that the same circumstances are used to establish both the agency relationship and the fraud. The Complaint alleges that Rothman and Chakos acted "at the request of, and with the full

24

knowledge, authority and acquiescence of Colon and Manta in soliciting Sequel's participation in the equity rights offering." (Compl. ¶ 21.) This allegation is separate from the circumstances where Sequel alleges fraud, and the agency relationship itself is not dependent on the allegations of fraud. Moreover, this situation is not comparable to that in *Lachmund* where the agency allegations relied on the allegations of conspiracy. *Lachmund*, 191 F.3d at 783. Accordingly, the heightened pleading standard is not required for the agency claims here. To properly plead agency Sequel was only required to provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

Even under the Rule 8(a) standard, however, defendants claim that Sequel has not adequately pled agency because it does not plead that Colon and Manta had the right to control the actions of Rothman and Chakos. Given that Sequel pleads an agency relationship and that Rothman and Chakos acted "at the request of, and with the full knowledge, authority and acquiescence of" Colon and Manta, the court cannot say that Sequel can prove no set of facts to prove an agency relationship. Therefore, so long as scienter is established with respect to Rothman and Chakos, the court will allow the claims against Colon and Manta to stand.

Concerning Rothman and Chakos, defendants argue that Sequel has failed to plead scienter based on motive or opportunity or based on facts that would constitute strong circumstantial evidence of conscious misbehavior or recklessness. Without addressing any scienter theory based on motive or opportunity, the court agrees with Sequel that it has adequately pled strong circumstantial evidence of conscious misbehavior or recklessness. Rothman and Chakos are alleged to have provided information to Sequel which purported to give future projections concerning Kenny's future viability. After the equity infusion took place, a

25

letter was provided to another equity investor which detailed problems Kenny was having during the time period that the future projections were furnished to Sequel. No mention of these problems was made to Sequel. On the basis that Rothman and Chakos either knew or should have known of the problems Kenny was experiencing at the time of the equity infusion, and because representations were made to Sequel without mention of these problems, a strong inference exists under these circumstances that the danger of misleading Sequel was either known to Rothman and Chakos or was so obvious that they must have been aware of it. *E.g.*, *Dardick*, 149 F. Supp. 2d at 987-98; *Chu* v. *Sabratek Corp.*, 100 F. Supp. 2d 827, 840 (N.D. Ill. 2000) ("On the other hand, the other individual defendants were all in positions to know the facts upon which plaintiffs rely to show scienter."); *In re Westell*, 2001 WL 1313785, at *11 (CFO was "in a position to know" that sales were falling but still noted increase in revenues, causing "strong inference that the danger of misleading the public was either known . . . or so obvious that he must have been aware of it."). For these reasons, the court concludes that scienter has been adequately pled against Rothman and Chakos.

### 3. Justifiable reliance

Defendants argue that Sequel cannot plead, or ultimately prove, justifiable reliance on any prior statements not contained in the Purchase Agreement because the Agreement contains a "non-reliance clause." *See Rissman* v. *Rissman*, 213 F.3d 381, 383-85 (7th Cir. 2000) ("a written anti-reliance clause precludes any claim of deceit by prior representations."). Defendants believe the following statement contained in the Purchase Agreement constitutes the non-reliance clause:

> This Agreement . . . and the Amended and Restated Operating Agreements supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof of this Agreement.

26

(Compl. Ex. A at ¶ 8.12.)

In *Rissman*, an action brought under § 10(b) and Rule 10b-5, the parties agreed that the plaintiff would sell his shares of a business to the defendants. As part of the negotiations, the plaintiff asked the defendants to put in writing a representation that they would never sell the business to another company. 213 F.3d at 383. The defendants refused any such representation and instead warranted orally that they were not aware of any offers to purchase the business and had not negotiated for its sale. Thereafter, in the parties' contract for the sale of securities, plaintiff stated that he had not relied on any prior oral statements:

> The parties further declare that they have not relied upon any representation of any party hereby released [Randall] or of their attorneys [Glick], agents or other representatives concerning the nature or extent of their respective injuries or damages."[8]

*Id.* at 383 (brackets in original). Nevertheless, after the plaintiff and the defendant completed their sale of the securities, the defendants sold the business to another company. The plaintiff then sued based on the earlier oral statements of the defendants regarding the sale of the business. *Id.* at 383. Because of the non-reliance clause, however, the court held that plaintiff could not make out the required element of justifiable reliance. Since plaintiff had assured defendants that he had not relied on any prior statements, the court concluded that no reasonable trier of fact

---

[8]The agreement also made clear that

(a) no promise or inducement for this Agreement has been made [plaintiff] except as set forth herein; (b) this Agreement is executed by [plaintiff] freely and voluntarily, and without reliance upon any statement or representation by Purchaser, the Company, any of the Affiliates or O.R. Rissman or any of their attorneys or agents except as set forth herein; (c) [plaintiff] has read and fully understands this Agreement and the meaning of its provisions; (d) [plaintiff] is legally competent to enter into this Agreement and to accept full responsibility therefor; and (e) [plaintiff] has been advised to consult with counsel before entering into this Agreement and has had the opportunity to do so.

*Id.* at 383.

could have been persuaded that the oral statements had been relied on. *Id.* "Securities law does not permit a party to a stock transaction to disavow such representations–to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." *Id.*

In reaching this conclusion, the Seventh Circuit relied on two other circuit opinions authored by then-Circuit Judges Stephen Breyer and Ruth Bader Ginsburg. *See Rissman*, 213 F.3d at 383-84 (citing *Jackvony* v. *RIHT Fin. Corp.*, 873 F.2d 411 (1st Cir. 1989) and *One-O-One Enters., Inc.* v. *Caruso*, 848 F.2d 1283 (D.C. Cir. 1988)). In both cases the courts held that the plaintiffs could not advance claims based on alleged oral representations when the contracts entered into constituted the entire agreement and superseded all prior agreements. *Jackvony*, 873 F.2d at 415-16; *One-O-One*, 848 F.2d at 1286-87.

Sequel, in response, states that *Rissman* is distinguishable because the clause in this case is only an integration clause, not a non-reliance clause. According to Sequel, an integration clause is a statement that "tell[s] a contracting party that extra-contractual statements are not part of the contract." *American Bank Int'l, Inc.* v. *Schlumberger Techs., Inc.*, No. 99 C 6434, 2002 WL 318290, at *1 (N.D. Ill. Feb. 25, 2002). Sequel believes that an integration clause does not negate any element of reasonable reliance but instead simply expresses the "metes and bounds of the contract." *Id.* (quoting *J.C. Whitney & Co.* v. *Renaissance Software Corp.*, No. 99 C 3714, 2000 WL 556610, at *10 (N.D. Ill. Apr. 19, 2000), *adopted in part on relevant grounds and modified in part on other grounds*, 98 F. Supp. 2d 981 (N.D. Ill. 2000)).

On the one hand, it is difficult to side with Sequel's view that the clause at issue is merely an integration and not a non-reliance clause. In *Rissman*, the Seventh Circuit agreed with the

28

courts in *Jackvony* and *One-O-One* that non-reliance clauses in written stock-purchase agreements precluded any possibility of damages under the federal securities laws for prior oral statements. Each of the clauses at issue in those cases were similar to the clause contained in the Purchase Agreement. *See Jackvony*, 873 F.2d at 416 (the Agreement "constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral . . . with respect to the subject matter."); *One-O-One*, 848 F.2d at 1286 (the Agreement "supersede[d] any and all previous understandings and agreements."). Indeed, the Seventh Circuit in *Rissman* expressly referred to the clauses in both *Jackvony* and *One-O-One* as "non-reliance clauses." 213 F.3d at 383.

At the same time, the court believes the claims Sequel has asserted here are not foreclosed by *Rissman*, *Jackvony* or *One-O-One*. In *Astor Chauffeured Limousine Co.* v. *Runnfeldt Inv. Corp.*, 910 F.2d 1540 (7th Cir. 1990), the court also discussed the issue of reasonable reliance in securities fraud cases. The plaintiff had purchased from the defendants all of the stock in a company defendants had previously owned. Thereafter, the plaintiff brought suit alleging, *inter alia*, violations of § 10(b). Plaintiff claimed that defendants lied about (1) who controlled the clients of the business, (2) a separate program run by another owner of the business, and (3) a separate and undisclosed ownership interest. *Id.* at 1543. The parties had a contract for the sale of the stock in the business, which defendants claimed superseded all prior oral representations which had been made, particularly because the contract contained an integration clause. *Id.* at 1545. In denying defendants' argument, the court noted that this was not a case (such as *Jackvony* or *One-O-One*) where "the written documents disclosed the truth, and the plaintiff insists that oral statements contradicted the writings." Instead the court noted

29

that the contract was silent about the issues which plaintiff claimed had been lies. *Id.* "A silent

contract does not prevent action based on an antecedent lie." *Id.* (citing *Acme Propane, Inc.* v.

*Tenexco, Inc.*, 844 F.2d 1317 (7th Cir. 1988)).

> The integration clause in *Astor* provided that

> This Agreement constitutes the entire agreement between the parties, and may not
> be amended or supplemented except by written instrument executed by an
> authorized agent or officer of each of the parties hereto.

*Id.*[9] The court stated that this clause implemented the Parol evidence rule and held as follows:

> Astor does not seek to recover on an agreement at variance with the terms of the
> contract. It says, rather, that there was fraud in the inducement. Claims of fraud
> in the inducement are not blocked by the parol evidence rule. Paragraph 10 is a
> different animal from the clauses in *Jackvony* and *Caruso*, which recited that the
> buyer had performed its own investigation and was not relying on any
> representations other than those on paper. We conclude that the contract does not
> affect Astor's ability to recover for antecedent oral fraud.[10]

*Id.; see also, Rowe* v. *Maremont Corp.*, 850 F.2d 1226, 1234 n.5 (7th Cir. 1988) ("In this case,

the written agreement between the Rowes and Maremont did not contradict Maremont's

representations and the failure to include the representations in the agreement did not result from

Maremont refusing to make written representations.").

Bearing in mind that "the issue of reasonable reliance has always depended upon an

analysis of all relevant circumstances," *see Rissman*, 213 F.3d at 388 (Rovner, J., concurring),

---

[9]The contract also contained a clause which stated that "[a]ll representations and warranties of the parties shall survive the closing of the transactions contemplated hereby." Clearly, the contract here contains no such language, but the court does not believe this language was dispositive to the court's ruling in *Astor*. Instead, as the court noted, the claims Astor brought were unrelated to the agreement but instead concerned oral misrepresentations which the defendants had made before the contract was signed that were not contained in the contract.

[10]In *Rissman*, the court distinguished *Astor* by noting that the "sort of no-reliance clauses that appeared in the Rissmans' agreement were missing from other transactions, such as the one[] in *Astor* . . . ." 213 F.3d at 385. There is no question that the clause in *Rissman* was much broader than the one in *Astor* or the one present here. The clause in *Rissman* specifically precluded any reliance on any representation of the parties not contained in the contract. *Id.* at 383.

the court believes the action here is more similar to that in *Astor* than *Rissman*, *Jackvony* or *One-O-One*. Sequel seeks relief not for prior oral agreements that contradict statements contained in the Purchase Agreement but, instead, because the defendants, in an attempt to induce Sequel to sign the Purchase Agreement, presented Sequel with allegedly misleading information. This is in no way comparable with the situations in *Rissman*, *Jackvony* or *One-O-One* where prior oral representations that were the basis of the plaintiff's claim were not included in the contract, and the contract itself specified that it constituted the entire agreement between the parties. Sequel does not attempt to change the terms of the Purchase Agreement or "recover on an agreement at variance from the terms of the contract." *Astor*, 910 F.2d at 1540. Rather, it asserts that the information furnished to it in attempt to form the contract was fraudulent and misleading.[11] The Purchase Agreement itself makes no mention of the projections defendants provided to Sequel, and it is a question of fact whether Sequel reasonable relied on such statements in determining whether to take part in the equity infusion. *Rowe*, 850 F.2d at 1234 n.5.

**B.    Count II: Section 20(a)**

Section 20(a) imposes liability on:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . to the same extent as such controlled person to any person to whom such controlled person is liable . . . .

15 U.S.C. § 78t(a). A plaintiff must not only show that "one person controlled another person, but also that the controlled person is liable under the [Securities Exchange] Act. If no controlled

---

[11] The court also finds this reasoning applicable to Chakos and Manta's claim that their "representations" were laid out in the contract itself. The court does not believe on this motion that these representations foreclose claims based on any alleged fraudulent or misleading information that was provided to Sequel to induce it to enter the Purchase Agreement.

31

person is liable, there can be no controlling person liability." *Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir. 1992).

Defendants argue that the Count II claims should be dismissed because Sequel alleges only that the "individual Defendants acted as controlling persons of Kenny within the meaning of Section 20(a) . . . ." (Compl. ¶ 81.) Defendants note that since the only persons or entities alleged to have been liable under § 10(b) are Rothman, Chakos, Colon, Manta, Cleanup and Industrial, and because Kenny itself is not alleged to be liable, no individual defendant can be liable as a controlling person of Kenny. Sequel acknowledges this problem and seeks leave to amend Count II to state a valid claim since "the Complaint's allegations clearly demonstrate that Sequel could allege primary liability on the part of Kenny." Since the court allowed claims to go forward in Count I, it will grant Sequel leave to amend the Count II claims.

## C.     State Law Claims

Counts III and IV of Sequel's Complaint allege common law fraud and violation of Section 12 of the Illinois Securities Law of 1953. Defendants argue for dismissal of these claims on the same grounds as the claims under § 10(b). Since some of those claims remain and some were dismissed, the motion to dismiss the Count III and IV claims are granted and denied as set forth above concerning the § 10(b) claims.

## CONCLUSION

For the reasons stated above, the motions to dismiss filed by Rothman and Colon [#12] and Chakos and Manta [#20] are granted in part and denied in part as set out above. Sequel is granted leave until December 15, 2003 to file its first amended complaint. The defendants shall

have 21 days thereafter to answer.  This case will be called for status on January 15, 2004 at 9:30

a.m.

ENTER: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: November 20, 2003